## Howard Shannon v. Axel Swanson.

1. INSTRUCTIONS—*Resumption of Marriage Relations After Separation Caused by Improper Conduct of Wife.*—An instruction which tells the jury that the fact that plaintiff had forgiven his wife and resumed marital relations with her would not of itself show connivance on the part of plaintiff or collusion between plaintiff and his wife to obtain a

judgment for damages against a person alleged to have seduced her, is improper, as calculated to lead the jury to understand that the resumption of marital relations could not be considered in determining that question, and did not tend to establish consent or connivance. It is for the jury to determine whether the fact that plaintiff and his wife resumed living together tended to show collusion or connivance.

2. EVIDENCE—*Immature Child as a Witness.*—Courts must hesitate to rely upon the testimony of a child of six years of age concerning facts that occurred over two years before the trial.

**Trespass on the Case.**—Seduction of wife. Appeal from the Circuit Court of DeKalb County; the Hon. CHARLES A. BISHOP, Judge presiding. Heard in this court at the April term, 1902. Reversed and remanded. Opinion filed October 14, 1902.

WILLIAM L. PIERCE and W. C. KELLUM, attorneys for appellant.

H. A. JONES and CLIFFE & CLIFFE, attorneys for appellee.

MR. JUSTICE DIBELL delivered the opinion of the court.

In this action, brought by Swanson against Shannon to recover damages for the alleged seduction of plaintiff's wife, we reversed a judgment for plaintiff in Shannon v. Swanson, 96 Ill. App. 275, on the ground the evidence did not warrant a verdict for plaintiff. Since then a second trial has been had, and plaintiff recovered a verdict for $2,500 and had judgment thereon. Defendant appeals. The main question is whether the testimony authorized a verdict for plaintiff. At this trial his little son testified for the first time. We shall first consider the case made by the other proof, and then the testimony given by the boy.

In March, 1899, plaintiff and his wife and son removed from Fairdale to Kirkland, both villages in DeKalb county. Defendant sold Mrs. Swanson a small house and lot for $450; she paid $100 down, and he gave her a contract for a deed, upon which she was to pay him $15 every three months, with annual interest. The Swansons took possession about April 1st. Plaintiff opened a tailor shop in the village. Defendant ran a restaurant near the depot, and also kept a team for the purpose of driving parties into the country when called upon, and he had recently inherited over $20,000 from his father's estate. A great intimacy

sprang up between plaintiff and defendant. They both were or became very intemperate. Plaintiff and defendant lived on the same street, and defendant's direct and usual route between his home and his restaurant was by plaintiff's house. During the entire summer of 1899 it was common practice for them to go home together as far as plaintiff's house, often when one or both were intoxicated, and plaintiff would take defendant into his house, and plaintiff would then go back to the business part of the village and return with a pail of beer bought with defendant's money, which they then drank in plaintiff's house. At other times as they came together from town, one or the other had a pail of beer along, and they went into plaintiff's house and drank it. This was substantially a daily occurrence; often it took place several times a day, sometimes as often as four times a day. Sometimes defendant alone was intoxicated when they came toward home together, and plaintiff would then take defendant into his house in that condition. During this period there were many quarrels between plaintiff and his wife, especially at night, greatly disturbing the peace and good order of the neighborhood. A woman living near by had heard Mrs. Swanson screaming a dozen times before the occasion which led to the separation. Some time in August, 1899, after a disturbance hereafter described, Mrs. Swanson left her husband and returned to her mother. Two or three weeks later she and her brother came to Kirlkand and removed the furniture to a woodshed or summer shanty owned by defendant. At that or some later date she gave up her contract for a deed, and defendant returned to her $50 of what she had paid on it. In September she rented a house in Rockford, and defendant hauled a load of her furniture there for her. On February 13, 1900, plaintiff began this suit. It was first tried in March, 1900, resulting in a verdict and judgment for plaintiff for $3,000. On July 25, 1900, plaintiff and his wife resumed and have ever since continued their marital relations, and have as the fruit of their reunion a second child, which was four months old at the time of the second trial, November, 1901.

On a certain Sunday afternoon, which some of the wit-
nesses say was July 31, 1899, and others place earlier in
July, defendant took Mrs. Swanson and her son in his
buggy to Blood's Point Cemetery, five, or six miles north
of Kirkland, and back again, leaving about two o'clock and
returning about five. Mrs. Swanson and her son got into
defendant's buggy on a street down town, and on their
return got out a few streets from her home. Defendant's
daughter and son had asked one Jesse Miner to watch
their father that afternoon, and he and defendant's son and
others saw Mrs. Swanson get into defendant's buggy.
Plaintiff testified defendant had been at his house that
Sunday morning; that he left defendant there and went to
bring home some clothing he had to repair for a customer
that day, and when he returned defendant was gone and
his wife was dressed up; and that he asked her where she
was going, and he started to tell what she told him, and
said " She said she was going—" but an objection being
interposed his counsel directed him to omit what his wife
said. He testified she went with the boy toward defend-
ant's place. Defendant testified that as he was passing
the house that Sunday morning Mrs. Swanson called to
him and asked him if he would take her and her boy riding
to Blood's Point, and he assented; that she said if she was
ready before he drove up she would be walking down
Main street; that he came by her house about two o'clock
in his buggy and called out, and did not see her, and then
drove on Main street and found her thirty or forty rods
from her house, and she and the boy got in and he drove
to the cemetery and stopped at the gate and hitched his
team and went on foot to a creamery or milk factory thirty
or forty rods beyond, telling Mrs. Swanson when she was
ready he would be at the factory; that he did not go into
the cemetery; that in about an hour Mrs. Swanson drove
up to the factory, and he got in and drove back to Kirk-
land by another road. He testified (without objection)
that Mrs. Swanson told him she had told her husband he
was going to take her out riding, but he did not know
whether plaintiff knew it or not. After plaintiff finished

his work that afternoon he went to defendant's house looking for his wife, and not finding her, got Jesse Miner and a buggy and they drove to Blood's Point Cemetery in search of her.    It is evident he had learned that she had gone to Blood's Point Cemetery with defendant, and no other source of such information except his wife is shown in the proof.    On the other hand Mrs. Swanson's act of entering and leaving defendant's buggy at a distance from her home indicates she did not wish her husband to know of the ride at once, though as she both entered and alighted from the buggy on a public street in broad day it can hardly be said there was any effort by her to keep the ride a secret from the public of that little village.    But defendant used no secrecy whatever about it.    Plaintiff proved by Mr. and Mrs. Daniel Miner that about one o'clock that afternoon defendant ʳstopped to chat on their porch, and being asked to stay to dinner excused himself on the ground he had promised his brother Park, who did not live at Kirkland, to drive Mrs. Swanson to Blood's Point Cemetery that afternoon, and to be there about three o'clock. Defendant drove by Mrs. Swanson's house in a thickly settled neighborhood and called out aloud for her.    He took her into his buggy on a public street in the early afternoon, with several persons in sight.    He drove on public highways, and had the boy along.    The proof is they did not drive away from the highway.    The cemetery was a public place where they were liable to meet people on this pleasant summer Sunday afternoon, and defendant testified there were people in the cemetery when he passed by.    There were two occupied dwellings directly opposite the cemetery, and a milk factory near by.    They returned to the village in the day time.    That evening, on a public street, defendant was heard telling a friend in loud tones that plaintiff had been following him and accusing him of things of which he was not guilty, and that he was going to go away and take the Keeley cure and then he would be all right.    Plaintiff testified that next morning he told defendant his little boy said they drove in the woods the day before and tied the horse to a tree and told

him to hold the lines and that "they went out of the buggy and Howard Shannon laid on mamma;" and that defendant replied, "You don't want to mind the little boy." Defendant testified plaintiff never made such a statement to him, and that he never had intercourse with Mrs. Swanson at the cemetery or anywhere else. After the morning when plaintiff says he made this statement to defendant, plaintiff continued to live with his wife, and the proof is very clear that he continued on the same terms of convivial friendship with defendant, drinking with him and at his expense, and taking him to his house, drunk or sober, and taking beer there for their joint use, the same as before. On the very day he says he told defendant what the boy said, plaintiff took defendant to his house twice, and again the next day.

Two or three weeks after that Sunday, there was a serious disturbance one night at plaintiff's house. Plaintiff testified it was about one o'clock, but the other proof on both sides is that it was about eleven o'clock. Plaintiff testified he woke up, missed his wife from the bed, went out in another room and found the kitchen door locked; that his wife finally opened the door, and she was in her night gown; that he asked what she was doing up at that time of night, and she told him to go to bed, and he concluded there was something wrong, and then the row began. Our former opinion shows we understood plaintiff testified at the first trial that at the time his wife was in the kitchen in her night dress, with the door locked against her husband, defendant was in the house with her. Plaintiff testified once on the second trial that when he got home that night defendant was in the house, though he did not know it then, but he afterward denied that he had made any such statement, and he testified he did not see defendant there till he was in the street with the other neighbors after the disturbance. Plaintiff and another witness testified plaintiff then declared to the neighbors that defendant had been in the house. His entire examination at the second trial shows this was merely his conclusion or belief, and he does not state any fact which justified such a con-

clusion, and there is no proof in the present record that defendant was in plaintiff's house that night till after the public disturbance. Plaintiff is contradicted as to what occurred there that night by every witness on either side who testified on the subject. Plaintiff testified on cross-examination that he was not making any disturbance; that the neighbors did not say anything to him about his racket or why they came; that there was no trouble at his house at all; that his neighbors simply walked over, looked at him, stayed two minutes and walked away, without saying why they came and without his knowing why they came. All the other proof shows plaintiff either testified untruly, or was so far intoxicated that he was unconscious of what occurred or unable to remember it. According to the other witnesses, sufficient noise proceeded from plaintiff's home, at about eleven o'clock that night, to awaken from sleep the neighbors in all the houses near by. One witness heard plaintiff's wife calling out, demanding to be let out. Another went to his window and called to the Swansons to know what was the matter. They quieted down and the neighbors went back to bed. Soon the disturbance broke out again, and was so violent that the neighbors generally, both men and women, got up and went out into the street. At that time defendant came along the sidewalk and joined the party. That is the first time the proof shows him in that vicinity that night. Two neighbors went to Swanson's door and asked what was the matter. Some one inside unlocked and opened the door and plaintiff and his wife appeared. Mrs. Swanson said her husband had been choking her and that she ran through the middle door and locked it, and he said he was trying to get the door open to see what she was doing, and he also said, " See what she has done to me," and said she had been attacking him, and called attention to his face, which appeared red, as if it had been scratched. One of the neighbors denounced the disturbance of his rest quite sharply, and demanded that it be stopped. Some of the neighbors remained in one of the · adjoining yards talking for an hour, and defendant was with them. Finally plaintiff and his wife called defendant

into the house, and he went in, and plaintiff assured defendant what certain neighbors had said about plaintiff was not true, while Mrs. Swanson, who was crying. reiterated the charge·that plaintiff had been choking her. Defendant stayed two or three minutes listening to them, and then left the house and went home.

Next morning Mrs. Swanson left her husband and left Kirkland, and went to her relations. Plaintiff testified he had no further friendly relations with defendant, and also that he immediately left Kirkland and went to live at Fairdale, and only returned to Kirkland the day his wife notified him to come there as she was going to move the furniture out of the house. In all this plaintiff is contradicted by every witness on either side who testified on these subjects. All agree he remained in Kirkland after his wife left. Most of them testify he continued to live in the same house till the furniture was moved out several weeks later, and that he took defendant to his house regularly and brought pails of beer to the house the same as before his wife left, and that the two were there intoxicated as before. One witness for plaintiff thought plaintiff boarded with Reuben Stenner after his wife left, but Stenner's testimony showed that was long after the furniture was moved out of the house. When Mrs. Swanson and her brother moved the furniture out of the house defendant helped, and it was moved into his woodshed or shanty. Defendant hauled a load of furniture to Rockford for her after she had rented a house there. Plaintiff is entitled to all legitimate inferences from these acts by defendant. But when Mrs. Swanson decided to give up the house and lot, natural self-interest would lead defendant to wish to get the furniture out of the house so that he might otherwise dispose of it, and as Mrs. Swanson had no other place then engaged it does not appear unreasonable he should permit it to be temporarily stored in his shed. He kept a team for the purpose of driving people about the country and doing other like work, and that fact furnished some explanation of his hauling the goods to Rockford. He was not asked

whether he was paid for the service, but he would naturally wish after a time to get her furniture off his premises, and if he hauled it away gratuitously, adultery is not a necessary inference from his act.

Plaintiff attempted to prove by Mr. and Mrs. Daniel Miner that defendant told them he had offered to pay Mrs. Swanson $57 to leave her husband. When all their testimony concerning this conversation is considered together it is of little value. It gradually developed from these witnesses that defendant said he had offered to pay back to Mrs. Swanson $57 of what she had paid on the place if she would execute papers relinquishing all claim to the place and giving the title back to defendant. Part of the time these witnesses added that defendant said " if she would leave her husband," and part of the time they omitted that. Miner first testified defendant said Mrs. Swanson was to pay him $57 on a settlement, and in repeating the conversation said defendant was to pay Mrs. Swanson back that sum, the witness apparently being unconscious of the change he had made in his testimony. Miner testified Mrs. Swanson was already in Rockford when this conversation took place, in which case she had already left her husband, and defendant had no occasion to offer to pay her to leave him. Mrs. Miner testified the conversation with defendant was some weeks before the ride to Blood's Point Cemetery, and no one else claims there had at that time been any talk about Mrs. Swanson leaving her husband or giving up her contract, or receiving back any part of what she had paid. It is unreasonable to believe defendant made any such statement at that time. Defendant denies he ever told the Miners he had offered to pay Mrs. Swanson anything to leave her husband. It is true that after Mrs. Swanson left her husband defendant offered to pay her back $50 of what she had paid on the contract if she would surrender her rights in the house and lot, and that she accepted the offer, and surrendered the property and contract, and defendant paid her back that sum. If any conversation took place between defendant and the Miners on that subject, the reasonable

conclusion is it was after defendant had made that offer and before Mrs. Swanson had accepted it and carried it out, and this was all after she had left her husband.

A man who worked in plaintiff's shop and boarded with him, testified that one day defendant left plaintiff's shop about eleven o'clock, and that as the witness and plaintiff afterward approached plaintiff's house on their way to dinner at noon, defendant came out of plaintiff's house and went toward his own home. Another witness testified to seeing defendant go to plaintiff's house alone several times in the day time, when the witness did not know whether plaintiff was in the house, nor who was there. This has some tendency to show defendant was at plaintiff's house when plaintiff was not there and when Mrs. Swanson may have been there. Defendant testified that when he visited the house plaintiff was there, and he went in by plaintiff's invitation, and that he was not there at all in plaintiff's absence except when plaintiff left him there to go for beer.

We have now stated the substance of the proof, except the testimony of the little boy. No act of adultery is shown. No disposition to commit adultery appears. It is not shown that either ever exhibited any preference for the society of the other, or that they ever even talked with each other. No one ever saw plaintiff and Mrs. Swanson alone together. They rode out together but once, and then it was in the daytime, in a public manner, and accompanied by the little boy. The testimony by plaintiff that he told defendant his little boy said defendant "laid on mamma," is the only suggestion of adultery in the evidence now under consideration. Defendant denies plaintiff made any such statement to him. It is unreasonable plaintiff should have continued his friendly relations with defendant, as he did, if such a conversation had taken place between them. Defendant impeached plaintiff by several witnesses, and a large number of witnesses were called to support him, but some of the supporting testimony was weak, one of the supporting witnesses saying he guessed plaintiff's reputation for truth was " fairly good." In many material mat-

Shannon v. Swanson.

ters plaintiff was contradicted by his own witnesses as well as by those called by defendant. The record contains some testimony assailing the motives which actuate plaintiff in this case, including his telling a witness if he did not get any money out of Park Shannon he was going to have it out of Howard Shannon, and that if she would be a witness for him and stay by him she would get a share of the money; and his statement to another witness that he was going to make a little stake out of Park and Howard Shannon; that he had the scheme worked so he could make quite a stake out of it. We conclude the evidence now under consideration did not warrant the verdict finding defendant had committed adultery with Mrs. Swanson and inflicting heavy damages upon him. We think the conclusion this proof warrants is that plaintiff's family relations were broken up for the time by his own intemperance and his resulting quarrels with his wife.

Harold Swanson, son of plaintiff and his wife, testified he remembered riding out one Sunday with his mother and Howard Shannon; that defendant " took his arm around her and kissed her; " that when they got in the woods in the cemetery " Howard Shannon laid on mamma," when he, Harold, was in the buggy holding the horse; that in his father's house in Kirkland when his father was not there Howard Shannon " laid on mamma on the bed in the bedroom; " and that defendant came to his mother's house in Rockford and "laid on mamma" there in the bed. If this testimony is entitled to credit, plaintiff had proof to sustain the verdict.

According to plaintiff's testimony Harold was four years old on February 7, 1899. He was therefore less than four years and six months old at the time of the ride to the cemetery. He gave this testimony more than two years and three months after that ride. If there was nothing else affecting the child's credibility the courts must hesitate to rely upon the testimony of a child of such extreme youth and upon his ability to distinguish between facts known to him and his recollection of what others in whom he con-

fides have told him or said in his hearing, and also upon his ability to remember facts for so long a time after the event. Common experience calls for great caution in acting upon the statements of one of such tender years, made so long afterward. Harold was not a witness at the first trial which was within eight months after the Sunday ride and still nearer the time of Mrs. Swanson's residence in Rockford. He was then so young it would have been a serious question whether the court should permit him to testify. His incompetency was recognized by plaintiff then. The twenty months intervening between the first and second trials no doubt improved his capacity to talk, but it could not fail to greatly dim if not efface his independent recollection of what occurred when he was almost a baby. But our hesitation is much increased in this case by the cross-examination of this child. He then stated that the day before he testified his mother told him that he saw defendant lying on mamma four times at Rockford, and five times at Kirkland and once out in the woods, and that he must remember it and swear to it when he came to court. He stated the time when they reached the cemetery as one o'clock, and when asked how he knew that, answered "Because mamma told me;" that she told him it was about one o'clock when they got to the cemetery and that day Howard Shannon laid on top of her once. He said he had told the truth when he said his mother had told him about these things, that he did not know anything except what his mother told him, and that she had talked with him more than once about them. On re-direct examination he was asked, "How do you know?" and answered, "Mamma told me." He was then asked, "How do you know Howard Shannon was lying on mamma out in the woods?" and answered, "Mamma told me." He was then asked, over defendant's objection and exception, "You may state to these gentlemen here whether you saw Howard Shannon lying on mamma with your own eyes?" and answered "Yes, sir." The pivotal question in the case was whether Harold was merely repeating what his mother told him,

and what he may have believed occurred because she had said it, or was telling what he remembered seeing himself. It was important that no suggestion on this subject should be made to this very immature child by the party calling him. We are of opinion the question should not have been put or allowed. (Coon v. People, 99 Ill. 368.) Counsel for plaintiff lay great stress upon one answer Harold gave on cross-examination. After he had stated his mamma told him he saw Howard Shannon lying on her out in the woods once, he was asked, "Did she tell you it was only once?" and answered, "Yes, sir;" and was then asked, "When did she tell you that—yesterday?" and he answered, "I know that my own self." But he also testified he knew this because his mother said so, and that she told him he must remember these things and swear to them in court, and that he knew nothing but what his mother told him. Which can the court rely upon? His statement "I know that myself," implies he was conscious he did not know of his own knowledge the other facts to which he had testified.

It is argued the boy appeared unusually intelligent upon the witness stand. The record does not sustain that claim. When he testified, he was six years and nine months old. He was asked when he was six years old, and answered "In Christmas," which was not true. He was asked what month Christmas was in, and said it was in September; and being asked in what part of September, said it was the first. He was asked where he first lived after leaving Kirkland and replied Geneva, whereas it was Rockford. He was asked how long they lived in Rockford and said seven months, whereas it appears to have been ten months. He twice said they moved to Rockford the Fourth of July, which was not at all correct, and when asked the year replied, "September." He said he knew they lived in Rockford seven months because "Mamma told me yesterday." He told how he saw each of the five occurrences at Kirkland and four at Rockford, and we are of the opinion it is very improbable a child so young should remember such details so long a time, and equally unlikely that

adulterers would subject their adulterous acts to the continuous inspection of a little child by leaving doors and windows open and window shades up, when this would have been avoided by the slightest precautions. It is not credible that the parties, if as profligate as claimed, should have been so extraordinarily open and shameless in exposing their licentiousness to view, not merely once, but on as many as ten occasions. It is to be noted in this connection that defendant testified that he unloaded the goods upon the sidewalk in front of Mrs. Swanson's house in Rockford, and did not go into the house, and never saw her again till she appeared in court at the first trial. After a careful examination of the testimony as it appears in full in the record, we conclude reliance ought not to be placed upon this evidence given by this very immature child immediately after being so unnaturally and minutely coached by his mother to testify to her repeated acts of shame, and that, too, long after she had returned to her husband, and when her only apparent motive was to share in the proceeds of a judgment in favor of her husband.

By two instructions given at plaintiff's request the jury were told that the fact that plaintiff had forgiven his wife and resumed marital relations with her would not of itself show connivance on the part of plaintiff or collusion between plaintiff and his wife, and would not as a matter of law have the effect to establish connivance or assent. There was testimony tending to show plaintiff was seeking to place defendant in a position where he could be made to respond in damages; that he had a scheme worked by which he expected to make quite a little stake out of defendant; and the manner in which the wife prepared her little boy to testify, and some other facts in the record, furnished grounds upon which defendant might submit to the jury the question whether connivance and collusion did not appear. It was for the jury to determine whether the fact that plaintiff and his wife resumed living together soon after the first judgment was rendered tended to show collusion or connivance. These instructions were calculated

to lead the jury to, understand that the resumption of marriage relations could not be considered in determining that question, and did not tend to establish consent or connivance. They were therefore improper. The fact defendant denied he was guilty did not prevent his submitting to the jury that he was the victim of an attempt to make him appear to be guilty.

The judgment is reversed and the cause remanded.